UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 14-cr-10299-RWZ |
| | : | |
| v. | : | |
| | : | |
| ANTONE ANDRADE | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

**I.     Introduction**

Defendant Antone Andrade hereby moves for compassionate release under 18 U.S.C. §3582 due to the fact that he is at substantial risk of contracting the COVID-19 virus due to his existing health status and preexisting medical conditions, and especially in light of the fact that this highly contagious virus is present and spreading within the facility at which he is currently incarcerated, FCI-Terre Haute.  In addition, Andrade is unable to take adequate measures to protect himself from contracting the virus and if he should contract it, it will likely result in severe complications or death.

**II.    Factual Background**

On August 26, 2015 Andrade pleaded guilty to a charge of conspiracy to distribute heroin.  21 U.S.C. §841(b)(1)(B).  On December 3, 2015, this Court sentenced Andrade to serve 120 months imprisonment (given his status as a career offender), followed by supervised release for a period of four years.  According to the BOP website, Andrade's release date is June 28, 2023.  www.bop.gov/inmateloc/.  Andrade was given credit for time served following his arrest

dating back to August 21, 2014. In short, Andrade has already served approximately 75 months of the sentence imposed by this Court.

**III.    Argument**

Given the COVID-19 global pandemic that is disproportionately causing serious illness and death among those with pre-existing medical conditions like Andrade, he faces a substantial risk of dying in prison if he should become infected. Even if he does not become infected, should he need medical care for any reason otherwise, the resources of the facility will likely be stretched too thin to provide him with substantive care. This unparalleled health crisis in our country and in our prisons present "extraordinary and compelling reasons" to grant this motion.

Indeed, the pandemic remains largely out of control and continues to grow. *See* Janice Hopkins Tanne, COVID-19: Virus is Out of Control, White House Admits, BMJ , Oct. 27, 2020 (quoting White House Press Secretary Mark Meadows: "We're not going to control the pandemic."), https://www.bmj.com/content/bmj/371/bmj.m4154.full.pdf . While a vaccine was recently distributed in very limited numbers, none will be available to prisoners for several months if not longer. Indeed, according to "internal Bureau of Prisons documents, . . . initial allotments of the vaccine 'will be reserved for staff.'" Michael Balsamo and Michael R. Sisak, Federal Prisons to Prioritize Staff to Receive Virus Vaccine, AP, Nov. 23, 2020, https://tinyurl.com/y2t46vnp. While many of those infected by SARS-Cov-2—the coronavirus that causes COVID-19—are asymptomatic, a large portion of those that develop COVID-19 likely will suffer life-long damage to their internal organs.

> Recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and immune systems. ***This damage is so extensive and severe that it may be enduring.*** Among other things, patients who

> suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward. Indeed, studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.

*Ruderman v. Kolitwenzew*, No. 20-cv-2082, 2020 U.S. Dist. LEXIS 83163, *5-6 (C.D. Ill. May 12, 2020) (emphasis added; citations omitted); Kathryn Krawczyk, The Week, *Even Mild Coronavirus Cases Can Cause Lasting Cardiovascular Damage, Study Shows* (July 28, 2020) (reporting on "a recent study of 100 recovered coronavirus patients reveals 78 of them now have ***lasting cardiovascular damage*** even though a vast majority of them had mild cases of COVID-19 in the first place") (emphasis added), https://theweek.com/speedreads/927908/even-mild-coronavirus-cases-cause-lasting-cardiovascular-damage-study-shows (last visited July 28, 2020).

More alarmingly, the mortality rate of COVID-19 is at least 10 times greater than seasonal flu. *See* Jake Ellison, UW News, *COVID-19: UW Study Reports 'Staggering' Death Rate in US Among Those Infected Who Show Symptoms*, (May 18, 2020), https://www.washington.edu/news/2020/05/18/ covid-19-uw-study-reports-staggering-death-rate-in-us-among-those-infected-who-show-symptoms/.  Also, "[a] new study . . . found that on average, those who died from COVID-19 ***lost more than a decade of their life to the disease***." Joseph Guzman, The Hill, *New Study Finds Coronavirus Can Cut Life Span by 10 Years or More*, (May 11, 2020) (emphasis added), https://thehill.com/changing-america/well-being/longevity/497097-those-who-died-from-covid-19-lost-more-than-a-decade-of.

As of this filing, over 17 million people within the United States have been confirmed infected and over 300,000 have died from COVID-19.  *See* Worldometer, *United States: Coronavirus Cases*, https://www.worldometers.info/coronavirus/country/us/ (last visited December 15, 2020).  Not surprisingly, "COVID-19 has [also] been spreading in jails and

prisons around the country. In some institutions, the disease has raged out of control." *United States v. Ramirez-Rodriguez*, No.0:20-cr-00028, 2020 U.S. Dist. LEXIS 65221, *6-7 (D. Minn.) (citing The New York Times, *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, https://nytimes.com/2020/03/30/us/ coronavirus-prisons-jails.html).

According to Dr. Shamsher Samra, Assistant Professor of Clinical Medicine at UCLA with clinical experience in LA County jails, in discussing the conditions at another BOP low security facility (FCI Lompoc):

> These conditions make it virtually impossible to ensure the safety of prisoners who remain housed at the facility if the current course is maintained. Even if the government made best efforts, effective social distancing is out of the question, particularly for those inmates who are effectively forced to be in a communal setting at all times due to their dormitory-style housing. Indeed, this combination of factors practically ensures that all remaining prisoners will eventually contract COVID-19 unless extraordinary measures are taken now. As if more evidence were needed of Lompoc's inability to ensure the safety of its prisoners, more than half of them have recently tested positive for COVID-19.

*Torres v. Milunsic*, No. 2:20-cv-04450 (Doc. 1 at 79, ¶ 14) (C.D. Calif. May 16, 2020) (Declaration of Shamsher Samra, M.D.). Accordingly,

> [t]he CDC has recognized the particular vulnerability of incarcerated persons to COVID-19 infection in its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." According to the CDC, correctional and detention facilities present "unique challenges for control of SARS-CoV-2 transmission among [inmates], staff, and visitors." Incarcerated people live, work, eat, study and participate in activities in congregate environments, with few options for social distancing due to crowded conditions. Daily staff movements, transfers of people between facilities and systems, and visits from outsiders such as family or legal representatives create many opportunities to introduce COVID-19 to a facility. ***The high turnover rate at correctional and detention facilities, as well as residents often coming from a variety of geographic locations, adds to the risk***.

> These risks are real. As of June 16, the five largest known clusters of COVID-19 in the United States grew inside correctional facilities. In May, the number of confirmed cases among prisoners doubled and deaths increased by 73 percent. One in seven tests conducted on prisoners was positive. The majority of infected people in prison are asymptomatic, but can still transmit the virus to more vulnerable people. . . . It is reported that incarcerated persons are being infected at a rate more than 6.5 times higher than in the United States. To address the rapid spread of COVID-19 in federal prisons, Congress passed the CARES Act authorizing the Attorney General to expand the use of home confinement to protect vulnerable prisoners from COVID-19 infection. Despite this legislative expansion, the BOP has transferred less than 5 percent of the individuals in its custody to home confinement.

*United States v. Babbitt*, No. 18-834, 2020 U.S. Dist. LEXIS 195976, *15-17, __ F. Supp. 3d __, 2020 WL 6153608 (E.D. Pa. Oct. 21, 2020) (emphasis added).

The impact on the BOP has been massive and unprecedented, and the BOP appears to be doing little to stop, let alone slow, the spread. As of December [15], 2020, the BOP is well into its third and largest surge to date. It is currently reporting a combined total of 7,919 active inmate and staff infections but inexplicably has slowed the reduction of its inmate population, which is the primary means of defeating transmission. While the cumulative number of inmate and staff infections now stands at 37,569 and growing, the BOP has transferred relatively few inmates to home confinement—save for a single, one-time mass transfer in early July—despite its statements to the contrary.

To give some perspective to these numbers, if the BOP were a country, it would have a higher rate of active infections than any of the ten most affected countries on earth including over twice the rate of the United States. In fact, the BOP has experienced more infections than many countries including Sri Lanka, Finland, Uganda, and Australia. *See* Worldometer, COVID-19 CORONAVIRUS PANDEMIC,

https://www.worldometers.info/coronavirus/#countries (last visited Dec. 16, 2020). The BOP

has experienced nearly five times the cumulative number of infections as Hong Kong, one of the most population-dense cities on earth with over 7.5 citizens. *See id.*

What is most alarming is the number of inmate deaths, which currently stand at 173 (including 12 housed at private facilities). From 2001 through 2016, the BOP experienced a *total* of 81 deaths as a result of accidents, 160 as a result of homicide, and 161 as a result of AIDS. COVID-19 has now killed more in nine months since the first infection in March than any of these causes did in 16 years. Over that same 16-year period, there were 260 suicides or 16.25 per year on average. COVID-19, on track to kill 236 inmates (alone) by next March, is now over 14 times deadlier than even suicides. On average, the BOP experiences only 374 deaths *from all causes* each year. COVID-19 has now increased that death toll by nearly a third. In all likelihood, COVID-19 is the deadliest event the BOP has ever encountered in its 90-year history.

Thus, and especially in light of the exceedingly high risk of the quick spread of infections inherent in the very design of prisons, it is disconcerting that now, nearly a year into the pandemic, the BOP *still* has no mandatory testing protocol for staff, who are most likely to introduce infections into facilities. Indeed, according to an internal BOP document ostensibly providing "Guidance for Staff Testing," institutions merely are "advised to identify methods for staff to be *voluntarily* tested for COVID-19." Federal Bureau of Prisons, Module 11. BOP Employee Management, Pt. E at 5 (Sept. 11, 2020) (emphasis added), https://www.bop.gov/foia/docs//Mod_11_Employee_Management_of_COVID_Pandemic_Response_Plan_08312020.pdf. In a startling aloof manner, the BOP simply "[s]uggest[s] mechanisms for this [voluntary] testing include developing a collaboration with a state or local Department of Health (DOH) or identifying local testing sites that allow for first responders/law

enforcement to participate in testing." *Id.* According to AFGE Council of Prison Locals President Shane Fausey, the head of the union for federal corrections officers, "[t]he BOP's expectation, under [BOP Medical Director] Dr. [Jeffrey] Allen's advice and direction, to relegate their workplace safety obligations upon local and state government agencies is irresponsible and objectionable." AFGE, AFGE BOP Council: BOP's Refusal to Test Correctional Officers for COVID-19 Is Irresponsible (June 15, 2020), https://www.afge.org/article/afge-bop-council-bops-refusal-to-test-correctional-officers-for-covid-19-is-irresponsible/.

Indeed, on December 1, 2020, this Court extended the time for a defendant to self-report by over two months due to the BOP's inability to get an outbreak at FCI Ft. Dix under control. *See United States v. Decoteau*, No. 4:18-440042, 2020 U.S. DIST. Lexis 223899, *5-6 (D. Mass. Dec. 1, 2020). As this Court recognized as to that facility, "the virus is highly contagious and there is no staff testing program." *Id.* at *5 (citing declaration of Assistant Warden Kimberly Kodger stating that "FCI Fort Dix does not test staff"). By all indications, there is not a staff testing program at Allenwood Low either, which likely is exacerbating the growing outbreak at Allenwood Low. With only six pending inmate tests as of December 15, 2020, it appears there is barely a testing regime for inmates either despite the rapidly growing number of infections at that institution. *See* BOP, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited Dec. 15, 2020).

    A.    **ANDRADE HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES**

This matter is properly before the Court as Andrade has exhausted his administrative remedies. *See* 18 U.S.C.§3582(c)(1)(A). Andrade submitted a letter to the Warden of FCI-Terre Haute requesting compassionate release on September 16, 2020. *Exhibit A*. The Warden (Mr. Lammer) denied his request on October 21, 2020. *Exhibit B*.

**B.     THIS COURT HAS AUTHORITY TO RESENTENCE ANDRADE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) GIVEN THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC, HIS HEALTH CONDITIONS, AND THE PRISON ENVIRONMENT WHICH PREVENTS SELF-CARE FOR A HIGH-RISK PATIENT**

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of the Bureau of Prisons ("BOP") to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons." Historically, when considering a motion for compassionate release, courts looked to USSG §1B1.13. However, that policy statement recapitulates an earlier version of 18 U.S.C. § 3582, which, by its terms, applies only to the "Director of the Bureau of Prisons." USSG §1B1.13. Indeed, Application Note 4 expressly provides that "[a] reduction under this policy statement may be granted *only upon motion by the Director of the Bureau of Prisons* pursuant to 18 U.S.C. § 3582(c)(1)(A)." *Id.* (emphasis added). Thus, it does not contemplate—nor could it have—the subsequent and substantive change to 18 U.S.C. § 3582(c)(1)(A) made on December 21, 2018 by the First Step Act, which for the first time provided an inmate with the right to move a court for compassionate release. As Judge Levy of the District Court of Maine has found, "[b]ecause the Sentencing Commission has not updated its policy statement since the enactment of the First Step Act, I conclude, as have other courts, that I should consider the policy statement, but that I am not bound to strictly apply it in deciding whether to grant compassionate release. Accordingly, the Court's authority to grant compassionate release is not limited by the policy statement's definition of 'extraordinary and compelling reasons' warranting a reduction in sentence under 18 U.S.C.A. § 3582(c)(1)(A)(i) after the First Step Act." *United States v. Calhoun*, No. 2:15-cr-0056, 2020 U.S. Dist. LEXIS 117527, *3 (citations omitted).

Whatever persuasive authority USSG §1B1.13 may have, though, the Commission clearly intended for compassionate release motions to be brought and granted more frequently.

8

*See* USSG §1B1.13, comment. (n.4) ("encourage[ing]" the Director to file such motions whenever warranted). As set forth in its Reason for Amendment to Amendment 799, the last substantive time the Commission addressed this policy statement, the Commission elicited "testimony from witnesses and experts about the need to broaden the criteria for eligibility, to add guidance to the medical criteria, and to remove other administrative hurdles that limit the availability of compassionate release for otherwise eligible defendants." USSG App. C, Amend. 799 (effective Nov. 1, 2016). Indeed, in testimony before the U.S. Sentencing's hearing on "Compassionate Release and the Conditions of Supervision," Michael Horowitz, the Inspector General for the U.S. Department of Justice, discussed two IG reports that "found serious issues with how the Department was running [the compassionate release] program and concluded that an efficiently-run compassionate release program combined with modifications to the program's eligibility criteria could expand the pool of eligible candidates, reduce overcrowding in the federal prison system, and result in cost savings for the BOP." Statement of Michael E. Horowitz, Inspector General, U.S. Dept. of Justice before the U.S Sentencing Commission at 3 (Feb. 17, 2016), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20160217/IG.pdf .

      As the U.S. Court of Appeals for the Second Circuit recently held, "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020); *United States v. Jones*, No. 20-3701, 2020 U.S. App. LEXIS 36620, *19, 2020 FED App. 0365P (6th Cir.), 13, __ F.3d __, 2020 WL 6817488 (6th Cir. Nov. 20, 2020) (joining "the majority of

9

district courts and the Second Circuit in holding that the passage of the First Step Act rendered § 1B1.13 'inapplicable'"); *United States v. Gunn*, No. 20-1959, 2020 U.S. App. LEXIS 36612, *4, __ F.3d __, 2020 WL 6813995 (7th Cir. Nov. 20, 2020) (following *Brooker*); United *States v. Hassan*, 2:16-CR-00084-JDL, 2020 U.S. Dist. LEXIS 195468, *2 (D. Me. Oct. 21, 2020) ("although I should consider the policy statement [at USSG §1B1.13], I need not strictly apply it when deciding whether to grant compassionate release"); *United States v. Owens*, No. 2:13-CR-00073, 2020 U.S. Dist. LEXIS 195463 (S.D. W.Va. Oct. 21, 2020); *United States v. Brown*, No. 18-CR-20, 2020 U.S. Dist. LEXIS 197394 (E.D. La. Oct. 23, 2020); *United States v. Taniguchi*, No. 2-00-CR-50, 2020 U.S. Dist. LEXIS 204777, *7-8 (N.D. Ohio Nov. 2, 2020) (This Court finds the reasoning set forth by the Second Circuit in Brooker to be compelling."); *United States v. Morgan*, No. 12-CR-233, 2020 U.S. Dist. LEXIS 199429 (E.D. Wisc. Oct. 27, 2020); *United States v. Goltz*, No. 00-CR-40069, 2020 U.S. Dist. LEXIS 185168, *10 (D.S.D. Oct. 6, 2020) ("This Court agrees with the reasoning of Judge Pratt, Judge Lange and the Second Circuit, and holds that a district court may use its discretion when it is considering the "extraordinary and compelling reasons" for a compassionate release."); *United States v. Knepper*, No. 05-00191 JMS, 2020 U.S. Dist. LEXIS 201134 (D. Haw. Oct. 28, 2020); *United States v. Anthony Davon Williams 03*, 2020 U.S. Dist. LEXIS 189794, *9, 2020 (D. Kan. Oct. 14, 2020) ("The court joins this prevailing view [set forth in *Brooker*], concluding that it may decide whether "extraordinary and compelling" reasons warrant compassionate release."); *United States v. Massey*, No. 3:17-cr-174-J-34JBT, 2020 U.S. Dist. LEXIS 205080, *4 (M.D. Fla. Nov. 3, 2020) ("The Court recognizes there is a split of authority over whether district courts are bound by the list of extraordinary and compelling reasons contained in U.S.S.G. § 1B1.13, cmt. 1(A)-(C). The Court's decision does not depend on the resolution of that issue because it would reach the same

10

conclusion if it had independent authority to identify extraordinary and compelling reasons."); *United States v. Price*, No. 07-0152-06 (ESH), 2020 U.S. Dist. LEXIS 184784, *9-10 (D.D.C. Oct. 6, 2020) ("Having concluded that 'the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release,' *Brooker*, 2020 U.S. App. LEXIS 30605, 2020 WL 5739712, at *7, the question remains whether the extraordinary and compelling reasons cited by Mr. Price warrant compassionate release. The Court concludes they do.").

This Court, therefore, is not cabined by USSG §1B1.13 and may, on its own, determine whether extraordinary and compelling reasons warrant relief, which the Commission encourages be granted as frequently as possible.

### C. ANDRADE HAS HYPERTENSION AND HIGH BLOOD PRESSURE, AND IS ALSO OBESE, AND IS THEREFORE AT HIGH RISK SHOULD HE CONTRACT THE COVID-19 VIRUS

Andrade is a 40-year old male who suffers from several serious medical conditions, including hypertension, high blood pressure, and obesity. Each of these medical conditions pre-existed his involvement in the instant case and are documented in his medical records. He is currently on multiple prescribed medications to address his high blood pressure and hypertension, including atenolol (25 mg), lisinopril (20 mg), and hydrochlorothiazide (25 mg). Andrade is also genetically predisposed to cancer and heart failure, and 10 of his father's 12 siblings have died from these serious medical conditions.

Several courts have held that hypertension is a high-risk factor that constitutes an extraordinary and compelling reason justifying compassionate release. *See, e.g. United States v. Soto*, No. 1:18-cr-10086-IT, 2020 WL 2104787, at *2 (D. Mass. May 1, 2020) ("Defendant's medical records show that he suffers from hypertension. This condition increases his risk for

serious complications from contracting COVID-19, including death."); *see also United States v, Salvagno*, No. 5:02-cr-00051-LEK, ECF No. 1181 (N.D.N.Y. June 22, 2020); *United States v. Pena*, No. 15-cr-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Separta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. April 20, 2020) (finding hypertension to be a comorbidity that increases the risk of death from COVID-19, and "reject[ing] the Government's contention that Mr. Separta's general good health before the pandemic speaks to whether he should now be released."); *United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 WL 1815851 (E.D.N.Y. April 10, 2020) (granting compassionate release to defendant suffering from hypertension).

Ten months into the COVID-19 pandemic, obesity has also turned out to be one of the clearest predictors of susceptibility to the virus and potential death if one contracts it. https://www.washingtonpost.com/health/coronavirus-obesity-risks/2020/09/04/0f370980-e22f-11ea-b69b-64f7b0477ed4_story.html. Many experts believe that obesity has contributed to the stunning coronavirus death and morbidity rate in the United States, which has one of the highest obesity rates in the world. And there is some evidence that it is particularly harmful for people under 60, who generally fare better than the elderly against the disease. A constellation of factors can influence a patient's outcome: fat can physically compress parts of the lungs, impeding respiration. In the hospital, it can make calculating medication doses, inserting intravenous tubes and moving patients more difficult. It can stimulate parts of the body's hormonal system, worsening COVID-19, a disease that often provokes a powerful inflammatory response itself.

In order to provide this Court with a complete picture of the level of care Andrade has received for these medical conditions while in BOP custody, he has requested copies of his BOP medical records, which have not been received at the time of this filing.  Andrade therefore reserves the right to supplement this motion once they are received.  However, in order to expedite receipt, Andrade respectfully suggests that this honorable Court order the Government to obtain copies of the same, distribute to counsel, and file them under seal as soon as practicable.

### D. THERE HAS BEEN A RECENT OUTBREAK OF COVID-19 AT THE FCI-TERRE HAUTE FACILITY WHERE ANDRADE IS INCARCERATED

As of the date of the filing of this motion, according to BOP's website, there are 143 confirmed cases of COVID-19 among the inmate population at Terre Haute, and 20 confirmed cases within the correctional staff.  In addition, the website indicates that another 289 inmates and 49 members of the corrections staff have contracted and allegedly recovered from the virus. www.bop.gov/coronavirus/

Andrade is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection.  He cannot self-quarantine or partake in "social distancing" in his prison facility.  He is housed in a high-density custodial situation which are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19.  Andrade also reports that there is no hand sanitizer available to the inmates and air circulation is very poor.  Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities are effectively incubators for the COVID-19 disease.  *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection. The Prison Policy Initiative has called on American jails and prisons to release medically vulnerable and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.[1] Similarly, members of Congress have written to the BOP to urge that efforts be made to allow immediate release of non-violent, elderly inmates.[2]

In sum, the COVID-19 virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to persons having the high-risk personal and medical profile of Andrade. The conditions at FCI Terre Haute do not allow Andrade to take the self-care measures required by the CDC to protect his own safety.

### E.     RELEVANT § 3553(a) FACTORS FAVOR COMPASSIONATE RELEASE

When extraordinary and compelling reasons are established, the Court must then consider the relevant sentencing factors in §3553(a) to determine whether a sentencing reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  In this case, a review of the Section 3553(a) factors, and Andrade's release plan of home confinement for the remainder of his unserved original term of imprisonment, favor granting his compassionate release.

---

[1] Peter Wagner & Emily Widra, "No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform," *Prison Policy Initiative* (March 6, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

[2] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

Congress's expansion of the compassionate release statute by § 603(b) of the First Step Act reflects congressional intent for courts to have greater flexibility to reduce sentences when compelling circumstances justify a later review.  The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," accentuates that intent.  The evolving case law also demonstrates that courts have construed their discretion generously to effectuate Congressional desire to increase the use of the compassionate release statute encouraged by this amendment.

Release of Andrade under the current extraordinary and compelling threat of a novel contagion would not serve to diminish the seriousness of the offense of conviction or create unwarranted sentencing disparity but would fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review.

First, Andrade has been in continuous custody since his arrest on August 21, 2014, and will has served over 75 months in prison. A sentence of 75 months is more than twice the overall median sentence for assault cases (36 months) in fiscal year 2019, nearly three times the overall median sentence imposed in extortion/racketeering cases (27 months), and is in fact greater than the overall median sentence imposed in manslaughter cases (60 months).   See U.S. Sentencing Comm'n, 2019 Sourcebook on Federal Sentencing Statistics, tbl. 27, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/Table27.pdf  (Ex. [C]).  In fact, a sentence of 75 months is over 4 times greater than the overall median sentence (18 months) imposed on all offenders in fiscal year 2019.  Thus, the time Andrade has already served is significant, and is in fact considerably longer than sentences imposed on those convicted of other serious offenses.

It bears emphasizing that these statistics were derived from pre-pandemic sentences. Indications are that sentences are declining overall in light of the pandemic. *See* Doug Berman, U.S. Sentencing Commission Releases Data Revealing COVID's Impact on Federal Sentencing, Sentencing Law and Policy Blog (Oct. 26, 2020) (noting overall average sentences decreased from 38 to 30 months in quarter ending June 2020), at https://sentencing.typepad.com/sentencing_law_and_policy/2020/10/us-sentencing-commission-releases-data-revealing-covids-impact-on-federal-sentencings.html .

Second, Andrade's projected release date is June 28, 2023. He has therefore served over 65% of the imprisonment portion of his 120-month sentence.

Third, Andrade is no longer a danger to the community. Despite his substantial prior criminal history, he is genuinely reformed, and his primary interest is to return home to Massachusetts to care for and support his family. While incarcerated he has completed his GED and taken several courses in a variety of subjects, as reflected on the attached transcript. *Exhibit C*. In short, Andrade intends to leave his past behind him. He has strong family support. If this motion is granted, he plans to reside with his wife and family and serve the remainder of his sentence in home confinement in Bourne, Massachusetts.

## IV.     Conclusion

For all the foregoing reasons, Andrade respectfully requests that the Court grant this motion and order his compassionate release to home confinement for a designated term, followed by a period of supervised release with conditions.

Respectfully submitted on December 17, 2020.

                              **ANTONE ANDRADE**

                              By his attorneys,

                              */s/ Paul V. Kelly*
                              Paul V. Kelly (BBO No. 267010)
                              Jackson Lewis, P.C.
                              75 Park Plaza
                              Boston, MA  02110
                              Tel (617) 367-0025
                              paul.kelly@jacksonlewis.com
                              benjamin.davis@jacksonlewis.com

## CERTIFICATE OF SERVICE

       I, Paul V. Kelly, that service of this motion was made on the above date by and through the ECF filing system.

                              */s/ Paul V. Kelly*
                              Paul V. Kelly

4842-5656-4436, v. 1